IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | | |
| UNITED STATES OF AMERICA ) | | |
| ) | Civil Action No. 3:19-cv-00465 | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Chief Judge Shelly D. Dick | |
| ) | Magistrate Judge Erin Wilder-Doomes | |
| WILLIAMS OLEFINS, LLC, n/k/a NOVA ) | | |
| CHEMICALS OLEFINS LLC. ) | | |
| ) | | |
| Defendant. ) | | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | | |

UNITED STATES' SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF CONSENT MOTION TO ENTER
STIPULATION OF SETTLEMENT

TABLE OF CONTENTS

I. BACKGROUND………………………………………………………………………...2

    A. The Facility and its New Operator…………………………………………………2

    B. The Incident………………………………………………………………………...2

    C. Post-Incident Investigations and Litigation against Williams………………………3

        i. The OSHA Investigation and Penalty Action…………………………………3

        ii. The LDEQ Investigation and Penalty Action…………………………………4

        iii. The CSB Investigation and Report…………………………………………...4

        iv. The EPA Investigation…………………………………………………………4

        v. Williams' Actions Post-Incident………………………………………………5

    D. Pre-Filing History of this Enforcement Action……………………………………6

    E. Procedural History of the Consent Motion…………………………………………7

II. RELEVANT STATUTORY AND REGULATORY PROVISIONS…………………………8

    A. The GDC……………………………………………………………………………8

    B. The Chemical Accident Prevention Provisions……………………………………9

III. VIOLATIONS ALLEGED IN THE COMPLAINT…………………………………………9

IV. THE PROPOSED STIPULATION OF SETTLEMENT……………………………………12

    A. The Civil Penalty…………………………………………………………………..12

    B. Effect of Settlement and Other Features of the Stipulation…………………………12

V. STANDARD OF REVIEW…………………………………………………………………13

VI. ARGUMENT……………………………………………………………………………...15

    A. The Proposed Stipulation is Fair…………………………………………………...15

    B. The Proposed Stipulation is Reasonable…………………………………………...17

    C. The Adequacy of the Civil Penalty Under CAA Section 112(r)……………………18

    D. The Proposed Stipulation is Faithful to the Objectives of the Clean Air Act………..23

VII. CONCLUSION……………………………………………………………………………24

TABLE OF AUTHORITIES

CASES

All Plaintiffs v. All Defendants, 645 F.3d 329 (5th Cir. 2011) .................................................... 17

Aro Corp. v. Allied Witan Co., 531 F.2d 1368 (6th Cir. 1976)..................................................... 23

Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128 (11th Cir. 1990)........... 20

United States v. BP Exploration & Oil Co., 167 F. Supp. 1045 (N.D. Ind. 2001) ................. 17, 23

Cotton v. Hinton, 559 F.2d 1326 (5th Cir. 1977) ............................................................... 1, 13-17

D. H. Overmyer Co. v. Loflin, 440 F.2d 1213 (5th Cir. 1971)...................................................... 23

Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519 (5th Cir. 2008).................................... 19

Ho v. Martin Marietta Corp., 845 F.2d 545 (5th Cir. 1988) ........................................................ 14

In re Beef Indus. Antitrust Litig., 607 F.2d 167 (5th Cir. 1979).................................................... 17

In re Chicken Antitrust Litig. Am. Poultry, 669 F.2d 228 (5th Cir. 1982).................................... 17

In re Deepwater Horizon, 910 F. Supp. 2d 891 (E.D. La. 2012) .................................................. 14

Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d 1006 (7th Cir. 1980) 13

Pettaway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir. 1978) ................................. 17

Ruiz v. McKaskle, 724 F.2d 1149 (5th Cir. 1984) ................................................................. 14, 17

Southern Pacific Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373
 (E.D. Tex. 2000) ........................................................................................................................ 14

Tull v. United States, 481 U.S. 412 (1987)................................................................................... 18

United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409 (6th Cir. 1991)................. 14, 15, 22

United States v. Amour & Co., 402 U.S. 673 (1971) ................................................................... 17

United States v. Browning-Ferris Ind. Chem. Serv., 704 F. Supp. 1355 (M.D. La. 1988) ......... 13

United States v. Cannons Eng'g Corp., 899 F.2d 79 (1st Cir. 1990)............................... 14, 15, 16

United States v. Chemical Found, Inc., 272 U.S. 1 (1926).......................................................... 16

United States v. City of Alexandria, 614 F.2d 1358 (5th Cir. 1980) ............................................ 17

United States v. City of Jackson, 519 F.2d 1147 (5th Cir. 1975) .................................................. 17

United States v. City of Miami, 664 F.2d 435 (5th Cir. 1981) .................................................... 13

United States v. Comunidades Unidas Contra la Contaminacion, 204 F.3d 275 (1st Cir. 2000). 19

United States v. Davis, 261 F.3d 1 (1st Cir. 2001) .............................................................. 13, 18

United States v. Hooker Chemicals & Plastics Corp., 540 F. Supp. 1067 (W.D.N.Y. 1982) ...... 23

United States v. McKinley County, 941 F. Supp. 1062 ........................................................ 16

United States v. Union Elec. Co., 132 F.3d 422 (8th Cir. 1997) .......................................... 13

United States v. Wallace, 893 F. Supp. 627 (N.D. Tex. 1995) ........................................ 14, 15, 16

Walker v. United States Dept. of Hous. & Urban Dev., 912 F.2d 819 (5th Cir. 1990) ............... 14

United States v. George A. Whiting Paper Co., 644 F.3d 368 (7th Cir. 2011) ........................... 13

STATUTES

42 U.S.C. § 7401(b)(1) ...................................................................................... 24

42 U.S.C. § 7412 ...................................................................................................... 8

42 U.S.C. § 7412(r) ................................................................................................. 8

42 U.S.C. § 7412(r)(1) ................................................................................ 1, 9, 10, 11

42 U.S.C. § 7412(r)(6) ............................................................................................ 3

42 U.S.C. § 7412(r)(7) ...................................................................................... 1, 9, 10

42 U.S.C. § 7413(e) .............................................................................................. 22

REGULATIONS

29 C.F.R. § 1910.119 ............................................................................................ 3

40 C.F.R. Part 68 ............................................................................................ 1, 19

40 C.F.R. § 68.3 ..................................................................................................... 9

40 C.F.R. § 68.10 ................................................................................................... 9

40 C.F.R. § 68.12(d) .............................................................................................. 9

40 C.F.R. § 68.67(e) ........................................................................................ 11, 21

40 C.F.R. § 68.69(a) ........................................................................................ 11

40 C.F.R. § 68.69(a)(iii) ................................................................................... 11

40 C.F.R. § 68.71(c) ........................................................................................ 11

40 C.F.R. § 68.73(d)(1) .................................................................................... 12

40 C.F.R. § 68.73(d)(4) .................................................................................... 12

40 C.F.R. § 68.130 ............................................................................................. 9

61 Fed. Reg. 31668 (June 20, 1996) .................................................................. 8

As requested by the Court, [ECF No. 5], Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency (EPA), respectfully submits this Supplemental Memorandum in Support of its Consent Motion to Approve Stipulation of Settlement between the United States and Williams Olefins, LLC, n/k/a NOVA Chemicals Olefins LLC (Williams *or* Defendant). [ECF No. 2].

As discussed below, the Stipulation of Settlement and the $750,000 civil penalty it imposes meet the Fifth Circuit's standard of review for such voluntary settlements and should be entered by the Court. *See* Cotton v. Hinton, 559 F.2d 1326, 1330-31 (5th Cir. 1977). The Settlement is fair, reasonable, adequate and in the public interest. *See id*. The substantial penalty imposed advances the twin goals of regulatory penalties: punishment and deterrence against future violations of the Clean Air Act. The settlement also reflects, however, the limited number of days of violation under Section 112(r)(1) and 112(r)(7) of the Clean Air Act (CAA), 42 U.S.C. §§ 7412(r)(1), (r)(7), that the United States is able to allege in this case and the limited scope of the relief available for the claims alleged in the Complaint. At the same time, nothing in the Settlement precludes other avenues of relief, *e.g*., tort actions by affected persons.

The proposed Stipulation of Settlement (Stipulation) [ECF No. 2], resolves the United States' claims for violations of Sections 112(r)(1) and 112(r)(7) of the Clean Air Act, and certain provisions of the Chemical Accident Prevention Provisions at 40 C.F.R. Part 68 (Chemical Accident Prevention Provisions), related to a June 13, 2013, explosion and fire which occurred at Defendant's olefins manufacturing plant located in Geismar, Louisiana (Incident).

This agreement was reached following multiple investigations into the Incident's cause, and only after substantial follow-up information was collected and the parties had engaged in lengthy deliberations involving technical staff, expert consults, and experienced counsel.

1

Entry of the Stipulation avoids the significant expenditure of time and resources that litigation would entail. Accordingly, the United States respectfully requests that the Court approve and sign the Stipulation of Settlement lodged with the Court on July 17, 2019 and enter it as a final judgment in this matter.

## I. BACKGROUND

### A. The Facility and its New Operator

1. At the time of the Incident, Defendant Williams was an "owner" and the "operator" of the olefins plant (Plant). [Pl's. Compl. at ¶¶ 1, 10, 27].

2. Roughly four years after the Incident, in July 2017, Williams sold its operating interest in the Plant to NOVA Chemicals Corporation, Alberta, Canada. This new corporation assumed full operational control of the Plant at that time. As part of the transaction the Plant was renamed NOVA Chemicals Olefins LLC to reflect the new management. [*Id.* at ¶ 3]. But, under the agreement, Williams retained responsibility for the claims asserted in the Complaint. Since the Incident, Williams and NOVA Chemicals Corporation have invested tens of millions to correct the underlying causes of the Incident. [Comeaux Decl. at ¶¶ 4(a), (b) and (e) at Attachment D].

### B. The Incident

3. On June 13, 2013, the Plant – then operating as Williams Olefins, LLC – experienced an equipment rupture, explosion, and fire within the Plant's Propylene Production Unit (PPU). [ECF No. 1, Pl.'s Compl. at ¶ 2, 64, *and* Hensley Decl. at ¶ 7]. The Incident destroyed two reboilers (*hereafter*, Reboiler A, and Reboiler B)[1], severely damaged the propylene fractionator tower, along with the piping systems transiting the PPU, in turn causing a release of extremely

---

[1]/A reboiler is a type of heat exchanger used in the petroleum and chemical manufacturing industries where heat input is needed to produce vapors from fluids passing through the reboiler. As used by the Defendant, the reboilers supplied heat to the "propylene fractionator" – a distillation column used to separate propylene from propane.

hazardous substances, including regulated flammable substances. The released substances ignited, setting off a fire that burned for more than four hours. [Pl.'s Compl. at ¶¶ 2, 62-68].

4. The Incident resulted in 2 fatalities, 167 injuries, road closures, and an order for persons living and working nearby to shelter-in-place. [*Id*. at ¶¶ 2, 65, *and* Hensley Decl. at ¶ 7].

C. Post-Incident Investigations and Litigation against Williams

5. Following the explosion and fire, investigations were conducted by the EPA, the U.S. Chemical Safety and Hazardous Investigation Board (*a/k/a* Chemical Safety Board or CSB),[2] the Occupational Safety and Health Administration (OSHA), and the Louisiana Department of Environmental Quality (LDEQ). Investigators interviewed Williams' employees, examined Plant infrastructure, inspected and tested the damaged equipment, and submitted multiple document requests to Williams.

i. The OSHA Investigation and Penalty Action

6. The Occupational Safety and Health Administration brought its own, separate enforcement action for claims arising out of the Incident. Within six months of the Incident, OSHA issued six administrative citations, five "serious" and one "willful" for the Defendant's violations of OSHA's Process Safety Management (PSM) regulations at 29 C.F.R. § 1910.119.[3] These violations concerned the PPU and alleged deficiencies in training verification, insufficient process safety information, failure to adhere to generally accepted good engineering practices, failure to conduct appropriate process hazard analysis, failure to determine and document appropriate responses to findings of compliance audit, and failure to develop written operating

---

[2]/Section 112(r)(6) of the CAA, 42 U.S.C. § 7412(r)(6) created the CSB to investigate and report to the public the cause of any accidental release resulting in a fatality, serious injury, or serious property damage.

[3]/EPA's Chemical Accident Prevention Provisions largely mirror OSHA's PSM regulations.

procedures for safely conducting activities involved in a covered process. OSHA assessed a civil penalty of $99,000.[4] Williams contested all six citations and ultimately settled them for $36,000.

ii. The LDEQ Investigation and Penalty Action

7. The state of Louisiana brought its own, separate enforcement action which secured a civil penalty for claims arising out of the Incident. On November 21, 2014, the LDEQ issued a Consolidated Compliance Order, citing the Defendant for thirty-two violations dating back to 2007. Of the thirty-two violations, four were ascribed to the Incident. LDEQ's claims related to the Incident are based on single-day violations of the state's air quality standards stemming from unauthorized emissions from the Incident. The parties settled the state's claims for $194,300, of which $15,600 was attributed to the four claims ascribed to the Incident. The remaining counts in the Order were the result of an unrelated air compliance review LDEQ began in 2009.

iii. The CSB Investigation and Report

8. In October 2016, the CSB issued a 74 page report analyzing the causes of the Incident. The CSB looked into all aspects of the Plant's operations, process safety culture, hazards assessment protocol, and training requirements in assessing the causes precipitating the Incident. Ultimately, Williams accepted and acted on the CSB's findings and recommendations. [*See generally* Comeaux Decl.].

iv. The EPA Investigation

9. As a direct result of the Incident, EPA inspector Dave Hensley, on June 24-28, 2013, conducted a Risk Management Program inspection at the Plant. EPA's objectives in conducting the inspection were two-fold: a) work with Plant personnel to improve Plant's chemical safety

---

[4]/OSHA's framework for assessing penalties sets a fixed dollar amount per violation that is based on the intentionality of conduct, *e.g.*, $7,000 for a "serious" or $70,000 for a "willful" violation.

management program, and b) to determine the Defendant's compliance with CAA Section 112(r) and the Part 68 regulations applicable to the Plant. [Hensley Decl. at ¶¶ 9, 10]. On June 25, 2013, Mr. Hensley was joined on the inspection by Bill Andrews, senior environmental inspector with EPA's Superfund Division, Region 6. [Hensley Decl. at ¶ 10].

10. Mr. Hensley coordinated EPA's inspection efforts with agency personnel from OSHA, the CSB, and various individuals from the Defendant's Environmental Corporate Health & Safety, and Employee Safety components. [Hensley Decl. at ¶ 11, 12].

11. During his on-scene inspection, and for months following the Incident, Mr. Hensley reviewed and analyzed hundreds of documents produced by Williams, as well as, the after-Incident reports compiled by OSHA and the CSB. [Hensley Decl. at ¶¶ 15-16, 18, 21].

12. Because Mr. Hensley believed that additional information was needed, EPA issued an information request to the Defendant. Williams responded to EPA's request on or about August 13, 2014, with 389 pages of additional documents. [Hensley Decl. at ¶¶ 19-20, 22].

13. Taking into account all sources of information, the EPA team reviewed thousands of pages of materials including original documents from Williams, electronic data from the Plant, interview notes, photographs, air sampling reports, weather reports, recordings and reports.

v. Williams' Actions Post-Incident

14. Immediately following the Incident, the Plant was shut down and remained so for eighteen months. During that time, the affected components within the PPU were rebuilt with extensive modifications to the PPU's design and safety systems. Significant new safety, training and operating procedures were also implemented Plant wide. [*See generally*, Comeaux Decl.].

15. Williams also conducted its own internal "root cause analysis" investigation. [*See* Comeaux Decl., Appendix 1]. The United States reviewed and considered the Williams'

report in evaluating an appropriate resolution of this case.

D. Pre-Filing History of this Enforcement Action

16. For several years prior to lodging the proposed Stipulation, the Parties engaged in substantive settlement discussions to resolve the alleged violations. The Parties negotiated a significant $750,000 civil penalty and the other terms of the proposed Stipulation. As part of of these discussions, the Parties also engaged in extensive information exchanges and negotiations to determine whether there was a need for injunctive relief to ensure that the Defendant's work to rebuild the affected components within the PPU complied with the CAA.

17. Throughout the settlement negotiations, Williams was represented by Peter S. Modlin. Mr. Modlin is a partner in the San Francisco offices of Gibson, Dunn & Crutcher LLP, in the firm's Environmental Litigation and Mass Tort practice.

18. More recently, Mr. Modlin was joined by Katie D. Bell to assist in matters relating to the Unopposed Motion to Enter Stipulation of Settlement. Ms. Bell is a partner in the Baton Rouge offices of Kean Miller LLP, in the firm's litigation group, with an expertise in class action litigation involving chemical exposures and catastrophic accidents.

19. The United States was represented by Kirk W. Koester, Trial Attorney, United States Department of Justice (DOJ), Environment and Natural Resources Division, Environmental Enforcement Section. Mr. Koester has 28 years of experience representing the United States in environmental matters, including other matters in this district. Mr. Koester was assisted throughout the negotiations by Mr. Jeffrey M. Clay, Assistant Regional Counsel, and Messrs. Dave Hensley, and Justin McDowell, air enforcement officers, United States Environmental Protection Agency. Mr. Clay has over 20 years of experience in Clean Air Act matters, including Section 112(r) enforcement actions. Messrs. Hensley and McDowell together have more than

twelve years of experience as risk management inspectors in EPA's Clean Air Act Risk Management Program. [Hensley and McDowell Decl. at ¶¶ 3 and 3, respectively].

20. The United States was further assisted by Mr. Neil P. Mulvey, principal, NPM Environmental & Safety, Inc. (NPM). Mr. Mulvey has more than thirty years of experience in industrial process safety and risk management, including process safety and risk management audits and inspections, process hazard analysis and facilitation, and process safety and risk management program development. Mr. Mulvey was retained to provide consulting and expert witness services concerning the United States' investigation of: a) the Incident, b) pre-Incident risk management programs and procedures in place at the olefins plant vis-à-vis the risk management program regulatory requirements and industry codes and standards for such processes, and c) the extent to which the damaged, and later rebuilt components within the PPU meet the regulatory requirements and industry codes applicable to the Plant. [*See generally*, Mulvey Decl. at Attachment A].

E. Procedural History of the Consent Motion

21. On July 17, 2019, the United States filed its Complaint concurrently with the lodging of the proposed Stipulation of Settlement. [ECF Nos. 1, 2].

22. The United States, on July 30, 2019, filed its Motion and Memorandum in Support of Consent Motion to Approve Stipulation of Settlement. [ECF Nos. 3, 3-1].

23. On August 15, 2019, the Court set the matter for oral argument on the fairness, adequacy and reasonableness of the Stipulation for August 28, 2019. At the request of the Parties, the hearing was continued to September 10, rescheduled to September 25, and rescheduled once again for December 11, 2019, with supplemental briefing papers due

December 6, 2019.[5] [ECF Nos. 5, 7, 8, 11, & 13].

## II. RELEVANT STATUTORY AND REGULATORY PROVISIONS

24. Clean Air Act Section 112(r), 42 U.S.C. § 7412, is intended to prevent accidental hazardous chemical releases from stationary sources and to minimize the consequences of those releases that do occur.[6] CAA Section 112(r), 42 U.S.C. § 7412(r), has given rise to two important, but distinct, legal programs: the General Duty Clause (GDC) and the Chemical Accident Prevention Provisions. The claims asserted in the Complaint are brought under Section 112(r)(1), also known as the GDC, and under regulations promulgated pursuant to Section 112(r)(7), also known as the Chemical Accident Prevention Provisions. *See* 42 U.S.C. § 7412(r)(1) and (7).

### A. The GDC

25. The GDC in Section 112(r)(1) imposes three related, but distinct duties upon the owners and operators of stationary sources producing, processing, handling or storing regulated substances or other extremely hazardous substances. These three duties, only two of which are relevant here, all relate to preventing accidental releases of such substances, like the Incident. In relevant part, the GDC requires owners and operators of such facilities to: a) identify hazards that may result from the accidental release of hazardous air pollutants, and b) design and maintain a safe facility. 42 U.S.C. § 7412(r)(1). "The general duty clause is a self-executing statutory requirement: it requires no regulations or other EPA action to take effect." 61 Fed. Reg. 31668, 31680 (June 20, 1996). Determining whether an owner or operator has met the GDC

---

[5]/We thank the Court for its courtesies in allowing these extensions.

[6]/Although CAA Section 112(r) and the Chemical Accident Prevention Provisions overlap with OSHA's PSM program, the two sets of requirements have distinct purposes. The Stipulation is thus not redundant with OSHA's administrative settlement. The CAA differs from OSHA's mandate to protect worker safety in that it has a broader purpose to protect the health of the general public and the environment.

requirements does not turn on specific regulations. Rather it focuses, in general, on whether a facility is being operated in accordance with "industry standards." *See* S. Rep. No. 228 at 3592-5 ("employer's awareness of the hazard may be documented by the existence of an industry code or consensus standard . . . which is used by others operating similar facilities within the industry").

B. The Chemical Accident Prevention Provisions

26. The EPA's Chemical Accident Prevention Provisions comprise a comprehensive set of requirements intended to prevent the accidental release of hazardous air pollutants from "covered processes." *See* 40 C.F.R. § 68.10. Covered processes are "processes" that use a regulated toxic or flammable substance (listed at 40 C.F.R. § 68.130) in an amount above the listed threshold quantity.[7] *See id*., and 40 C.F.R. § 68.3 (*defining* covered process). Covered processes must comply with sets of specific requirements to prevent accidental releases. *See* 40 C.F.R. § 68.12(d). At the time of the Incident, the PPU was a covered process because it included more than threshold quantities of regulated flammable substances, including, propylene, ethylene, 1,3 butadiene, and propane. *See* CAA Section 112(r)(3) and 40 C.F.R. § 68.130, Tables 3 & 4 (listing regulated flammable substances).

27. The Complaint alleges violations of the Chemical Accident Prevention Provisions relating to hazard analysis, proper operating procedures, and employee training, among others.

III. VIOLATIONS ALLEGED IN THE COMPLAINT

28. The United States' Complaint asserts seven claims for relief under Sections 112(r)(1) and (r)(7) of the CAA, 42 U.S.C. §§ 7412(r)(1) and (r)(7), and certain provisions of the Chemical

---

[7]/*Process* includes "any activity involving a regulated substance including any use, storage, manufacturing, handling, or on-site movement of such substances, or combination of these activities." *See* 40 C.F.R. § 68.3.

Accident Prevention Provisions, in connection with the Incident. [Pl.'s Compl. at ¶¶ 69-117]. These claims stem from the Incident and from EPA's post-Incident inspection.

29. The United States alleged three violations of the General Duty Clause in Counts 1-3. [Pl.'s Compl. at ¶¶ 69-91]. These violations include:

30. <u>Count 1</u> – We allege that Williams violated 42 U.S.C. § 7412(r)(1) by failing to identify hazards associated with not fully isolating offline Reboiler B from process operations, and by failing to recognize that flammable hydrocarbon liquids had leaked into the offline and out-of-service reboiler, which was not connected to the unit's pressure relief system. Specifically, the Defendant's failure to identify such hazards resulted in an explosion and fire when Reboiler B over-pressurized and ruptured. [Pl.'s Compl. at ¶¶ 69-76]. This is a single-day violation because it is limited to the events on the day of the Incident.

31. <u>Count 2</u> – We allege that Williams failed to comply with 42 U.S.C. § 7412(r)(1) in the following two ways: a) by failing to take steps necessary to prevent the accumulation of flammable hydrocarbon liquid in Reboiler B, and by b) failing to resolve Process Hazard Analysis (PHA) recommendations to provide adequate overpressure protection for Reboiler A and Reboiler B. [Pl.'s Compl. at ¶¶ 77-84]. This is a single-day violation because it is limited to the events on the day of the Incident.

32. <u>Count 3</u> – We allege that the Defendant violated 42 U.S.C. § 7412(r)(1) by failing to take steps necessary to prevent the release of extremely hazardous substances. Specifically, Williams failed to establish written procedures, or alternatively adequate procedures, for troubleshooting problems related to the quench water system flow to Reboilers A and B. [Pl.'s Compl. at ¶¶ 85-91]. This is a single-day violation because it is limited to the events on the day of the Incident.

10

33. The Complaint, Counts 4-7, alleges four violations of the Chemical Accident Prevention Provisions, each of which is based on highly fact-intensive evaluations of technical details about the PPU and the industry standards that apply to its safe operation. [Pl.'s Compl. at ¶¶ 92-117]. These violations include:

34. Count 4 (40 C.F.R. § 68.67(e)) – This provision required the Defendant to promptly address any PHA findings, promptly resolve any recommendations made, and document their resolution in the Plant's PHA Action-Item Tracking System. Here, we allege that the Defendant failed to promptly resolve and thereafter document in the Plant's PHA Action-Item Tracking System, sixteen findings and recommendations[8] stemming from a 2011 PHA study of the Plant's Acetylene, Propylene, Methyl Acetylene, Propadiene, and Ethylene Systems on or before the June 13, 2013 Incident. [Pl.'s Compl. at ¶¶ 92-96]. This is a multi-day violation.

35. Count 5 (40 C.F.R. § 68.69(a)(iii)) – Pursuant to 40 C.F.R. § 68.69(a) Williams was required to "develop and implement written operating procedures . . . for safely conducting activities involved in each covered process . . . ." 40 C.F.R. § 68.69(a)(iii) further mandates that Williams prepare such written procedures for safely conducting "temporary operations" at the Plant. We allege that Williams failed to establish written operating procedures for troubleshooting the quench water circulation system in the PPU, a temporary operation. [Pl.'s Compl. at ¶¶ 97-102]. This is a single-day violation because it is limited to the events on the day of the Incident.

36. Count 6 (40 C.F.R. § 68.71(c)) – This provision required Williams to "ascertain that each employee involved in operating a process has received and understood the training required," and thereafter, document the "identity of employee, the date of training, and the means

---

[8]/Two of the sixteen recommendations relate to the Incident, *viz.*, provide overpressure protection to Reboiler A and Reboiler B, and update the PPU's piping and instrumentation diagram (P&ID) to reflect this change.

used to verify that the employee understood the training." Here, we allege that on the day of the Incident, Williams failed to "ascertain" and "document" that its employee, G. Scott Thrower (deceased), had received and understood the training required to operate and troubleshoot Reboiler B's quench water system. [Pl.'s Compl. at ¶¶ 103-109]. This is a single-day violation because it is limited to the events on the day of the Incident.

37. <u>Count 7</u> (40 C.F.R. § 68.73(d)(1) & (4)) – Pursuant to 40 C.F.R. § 68.73(d)(1) the Defendant was required to inspect and perform tests on Reboiler A to ensure its mechanical integrity. Thereafter, pursuant to 40 C.F.R. § 68.73(d)(4), Williams was required to document the inspection and test with specific details. We allege that Williams started, but did not complete the required mechanical integrity test, but nonetheless recorded the test as having been completed in the Plant's Action-Item Tracking System. [Pl.'s Compl. at ¶¶ 110-117]. This is a single-day violation involving Reboiler A, which was not an underlying cause of the Incident.

IV. <u>THE PROPOSED STIPULATION OF SETTLEMENT</u>

A. <u>The Civil Penalty</u>

38. Williams must pay a civil penalty of $750,000 to the United States within thirty days after the Stipulation's Effective Date. [Stip. § V, ¶ 9]. The Stipulation contains two terms intended to ensure the Defendant's compliance. First, if Williams fails to pay the civil penalty when due, the United States may move to vacate the Stipulation and reinstate the action. [*Id.* at § V, ¶ 10]. Second, the Stipulation requires a $10,000 per day stipulated penalty for each day the payment is late. [*Id.* at § VI, ¶ 13]. Accrued stipulated penalties must be paid within thirty days of receiving the United States' written demand for payment. [*Id.* at § VI, ¶ 14].

B. <u>Effect of Settlement and Other Features of the Stipulation</u>

39. The Stipulation includes other terms to ensure the Defendant's compliance with the

Stipulation and protect the public's rights. The Stipulation expressly reserves all legal and equitable remedies available to enforce the Stipulation, and to address any imminent and substantial endangerment to the public health or welfare or the environment. [Stip. at § VII, ¶ 19]. The Stipulation does not limit or affect the rights of third parties. [*Id.* at § VII, ¶ 22]. The Court retains jurisdiction over this case for the purpose of interpreting the Stipulation and enforcing compliance with its terms. [*Id.* at § XI, ¶ 29]. The Stipulation also contains a process for terminating the agreement after the Defendant pays the civil penalty, and any accrued stipulated penalties. [*See id.* at § XII, ¶¶ 30-31].

## V. STANDARD OF REVIEW

40. To support entry of this Stipulation, this Court's review need only determine that the settlement embodied in the Stipulation is "fair, adequate, and reasonable," Cotton v. Hinton, 559 F.2d at 1326, 1330, as well as "consistent with the public objectives sought to be attained by Congress," United States v. City of Miami, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring). *See also* United States v. Browning-Ferris Ind. Chem. Serv., 704 F. Supp. 1355, 1356-57 (M.D. La. 1988). The Fifth Circuit mirrors other courts' deferential standard of review of voluntary settlements. *See, e.g.*, United States v. Union Elec. Co., 132 F.3d 422, 430 (8th Cir. 1997); United States v. Davis, 261 F.3d 1, 23-28 (1st Cir. 2001); United States v. George A. Whiting Paper Co., 644 F.3d 368, 372 (7th Cir. 2011).

41. "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims . . . ." City of Miami, 664 F.2d at 441 n.13 (*quoting* Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1014 (7th Cir. 1980)). Although the court does not act simply as a "rubberstamp" for such settlements and is entitled to analyze the facts and law relevant to the proposed compromise, the

court should not "substitute its judgment for that of the parties to the decree." United States v. Wallace, 893 F. Supp. 627, 631 (N.D. Tex. 1995) (citation omitted); *see also* Ruiz v. McKaskle, 724 F.2d 1149, 1152 (5th Cir. 1984) (*citing* Cotton, 559 F.2d at 1330) (the court's assessment of fairness, adequacy, and reasonableness should focus on the terms of the settlement). In reviewing the settlement the court does not inquire "whether the settlement is one which the court itself might have fashioned, or considers ideal . . . ." United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990); *see also* In re Deepwater Horizon, 910 F. Supp. 2d 891, 944 (E.D. La. 2012), *aff'd sub nom.*, 739 F.3d 790 (5th Cir. 2014) (class action settlement) ("[T]he Court is not authorized to insist upon changes that, in its judgment, might lead to a superior settlement").

42. This deferential standard of review promotes a "public policy strongly encourag[ing] the settlement of cases." Ho v. Martin Marietta Corp., 845 F.2d 545, 547 n.2 (5th Cir. 1988). *See also*, Cannons, 899 F.2d at 84 ("[I]t is the policy of the law to encourage settlements"). Settlements conserve courts' and litigants' resources and should be upheld whenever equitable and policy considerations so permit. *See* Walker v. United States Dept. of Hous. & Urban Dev., 912 F.2d 819, 825 (5th Cir. 1990). The presumption in favor of voluntary settlements is "particularly strong where a [Settlement] has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA, which enjoys substantial expertise in the environmental field." United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1436 (6th Cir. 1991) (*citing* Cannons, 899 F.2d at 84; *see also* Southern Pacific Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373, 383 (E.D. Tex. 2000) ("Settlement . . . is particularly encouraged where, as here, a government actor committed to the protection of the public interest has determined that settlement of a particular claim is appropriate."); Wallace, 893 F. Supp. at 631 (recognizing strong presumption of validity in EPA settlement). Only a finding that the

14

Stipulation is a product of "fraud, collusion, or the like" should preclude its entry. Cotton, 559 F.2d at 1330.

## VI. ARGUMENT

43. The Stipulation and the settlement it reflects are fair, reasonable, adequate, and consistent with the public health and environmental protection goals of the Clean Air Act. The Stipulation should therefore be approved and entered as a final order of the Court.

### A. The Proposed Stipulation is Fair

44. The Stipulation is both procedurally and substantively fair. *See* Cannons, 899 F.2d at 86 (explaining that "fairness in the . . . settlement context has both procedural and substantive components"). Procedural fairness considers the "candor, openness, and bargaining balance" of the negotiation process. *See, e.g.*, Wallace, 893 F. Supp. at 632. "Substantive fairness encompasses the concepts of corrective justice and accountability[.]" *Id*. Substantive fairness is related to procedural fairness because "[t]o the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." Cannons, 899 F.2d at 87 n.4 (citation omitted). To determine whether a proposed settlement is procedurally and substantively fair, courts look to factors such as "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." Akzo Coatings, 949 F.2d at 1435 (citation omitted).

45. Negotiations leading up to the Stipulation were adversarial and at arm's-length, and conducted in manifest good-faith over a lengthy period of time. Both parties had experienced legal counsel present and expert consultants and technical representatives available throughout the negotiations, all of whom vigorously advocated on behalf of their respective positions. The

United States was represented by attorneys and technical staff from the DOJ and EPA. The Defendant was similarly represented by both experienced outside legal counsel as well as in-house operations and technical personnel. In reviewing and approving the Stipulation, additional senior representatives of DOJ, EPA and the Defendant ultimately determined that the Stipulation is fair. The fact that the negotiations were "arm[']s length settlement negotiations conducted in good faith by experienced legal counsel," Wallace, 893 F. Supp. at 632, demonstrates that there was "procedural fairness" without collusion. *See also*, Cannons, 899 F.2d at 84 (fact that "affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree" itself favors a finding that this settlement is the result of a fair process). Moreover, public officials of the United States are entitled to a presumption that their actions and decisions are not illegal or a product of collusion. *See* United States v. McKinley County, 941 F. Supp. 1062 (D.N.M. 1996) (*citing* United States v. Chemical Found, Inc., 272 U.S. 1, 14-15 (1926)).

46. Under the Stipulation, the Defendant will be held accountable for its alleged non-compliance. *See* Cannons, 899 F.2d at 87 (explaining that "a party should bear the cost of the harm for which it is legally responsible"). Here, Williams must pay a substantial civil penalty, one that reflects the seriousness of the alleged CAA violations, holds the Defendant accountable, and provides a strong deterrent against similar future violations at the Facility. Because the Facility was shut down immediately after the Incident, and remained inoperable over the ensuing eighteen months during which time the affected components within the PPU were rebuilt, with extensive modifications being made to the Plant's design and safety systems, operations protocol and training regimen, the penalty amount reflected in the settlement is fair.

16

B. <u>The Proposed Stipulation is Reasonable</u>

47. In addition to its fairness, the Stipulation represents a reasonable settlement of Williams' alleged violations. Entry of the Stipulation serves the public interest by securing strong results more quickly and at less cost than could be achieved through litigation. The likely alternative to the proposed settlement would be protracted complex litigation that would expend limited governmental and judicial resources. *See* <u>United States v. BP Exploration & Oil Co</u>., 167 F. Supp.2d 1045, 1053 (N.D. Ind. 2001) (acknowledging the government's and court's limited resources).

48. Of course, as with any settlement, the Stipulation is a product of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." <u>United States v. City of Jackson</u>, 519 F.2d 1147, 1152 (5th Cir. 1975) (*quoting* <u>United States v. Amour & Co</u>., 402 U.S. 673, 682 (1971). The Fifth Circuit's "strong judicial policy favoring settlements" recognizes that "compromise is the essence of settlement." <u>In re Chicken Antitrust Litig. Am. Poultry</u>, 669 F.2d 228, 238 (5th Cir. 1982). *Accord* <u>U.S. v. City of Alexandria</u>, 614 F.2d 1358, 1362 n.9 (5th Cir. 1980).[9] But, "[t]he trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" <u>Cotton</u>, 559 F.2d at 1330; *see also* <u>Ruiz v. McKaskle</u>, 724 F.2d at 1152 ("[T]he district court evaluates the terms of the compromise in relation to the likely benefits of a successful

---

[9]/The Fifth Circuit has reiterated this standard in a variety of contexts. *See, e.g*., <u>Pettaway v. American Cast Iron Pipe Co.</u>, 576 F.2d 1157, 1169 (5th Cir. 1978) (civil rights class action); <u>In re Beef Indus. Antitrust Litig.</u>, 607 F.2d 167, 179 (5th Cir. 1979) (antitrust class action); and <u>All Plaintiffs v. All Defendants</u>, 645 F.3d 329, 334 (5th Cir. 2011) (disposition of unclaimed funds from antitrust class action).

trial"). The courts need not examine the reasonableness of a proposed settlement for mathematical precision and should defer to the EPA's judgment on whether the settlement is reasonable. *See* Davis, 261 F.3d at 26. Accordingly, the Stipulation is a reasonable settlement in the public interest.

C. The Adequacy of the Civil Penalty Under CAA Section 112(r)

49. The $750,000 civil penalty that the Defendant will pay serves the twin goals of punishment and deterrence. *See* Tull v. United States, 481 U.S. 412, 422-23 (1987). The CAA's Section 113(e)(1), instructs the "Administrator or the court, as appropriate," to consider seven penalty factors (in addition to such other factors as justice may require) when determining an appropriate civil penalty. These factors, known as the *statutory penalty factors* are:

a. the seriousness of the violations,
b. the economic benefit of noncompliance,
c. any other penalty for the same incident,
d. the violator's compliance history and good faith efforts to comply,
e. the duration of the violation(s),
f. the size of the business, and
g. the economic impact of the penalty on the violator.

50. As discussed below, only one of the seven violations alleged in the Complaint was considered to be a multi-day violation, with a potential civil penalty liability of more than the $37,500 statutory per day maximum. The statutory maximum penalty is assessed on a violation by violation basis, not on the totality of the settlement

51. In order to provide for the consistent development of proposed penalties utilizing the statutory factors, the EPA has a CAA Penalty Policy that provides a framework for analyzing the "statutory factors" to ensure that the agency properly accounts for the statutory penalty factors in determining settlement penalties.[10] [McDowell Decl. at ¶ 11]. The Court should defer to the

---

[10]/*See* EPA's June 2012 "Combined Enforcement Policy for Clean Air Act Sections 112(r)(1), 112(r)(7) and 40 C.F.R. Part 68 (Penalty Policy), at https://www.epa.gov/sites/production/files/documents/112rcep062012.pdf. By its

United States' analysis of the reasonableness of the penalty under this well-established and consistently applied EPA framework. *See* Envtl. Conservation Org. v. City of Dallas, 529 F.3d 519, 531 (5th Cir. 2008) (noting penalty in consent decree "represents the federal government's discretionary resolution of the level of penalty needed"); *see also* United States v. Comunidades Unidas Contra la Contaminacion, 204 F.3d 275, 282 (1st Cir. 2000) (stating that "[w]e are unable to say that the penalty level established by the decree represents an abandonment of judgment by the United States").

52. "The United States thoroughly weighed and considered the statutory penalty factors" in combination with EPA's CAA Penalty Policy "in reaching the proposed settlement with Williams." "This analysis supports the appropriateness of the penalty assessed." [McDowell Decl. at ¶ 32].

53. Under the first statutory penalty factor, the United States considered the seriousness of the violations. The seriousness of a violation depends in part on the risk posed to the surrounding population and the environment as a result of the violation. EPA analyzed the risk as a "function of the extent of the deviation from the [relevant] requirements, the likelihood of a release, and the sensitivity of the environment around the facility." The greater the "extent of deviation," the "more likely that [Williams] has compromised the safe operation of the [Plant], and the safe management of the chemicals" inventoried at the Plant. [McDowell Decl. at ¶ 18]. Here, EPA considered Williams' violations as "major" for their potential to harm human health and the environment, and for the extent of deviation from the Part 68 requirements. In addition, EPA considered the flammability of the regulated chemicals involved in the Incident in assessing the seriousness of the violations. EPA also considered the on-site damages as well as the impact

terms, the policy should be used "to develop settlement penalty amounts for civil judicial enforcement actions . . . ," but it is "not binding on the Agency.

on the surrounding industrial and residential properties in the vicinity of the Plant. While the Incident caused millions of dollars in damage to the Plant, EPA did not find that the Incident resulted in damage to off-site property. [McDowell Decl. at ¶ 23]. Finally, EPA and LDEQ conducted post-Incident air monitoring at 10 sites at two-hour intervals from approximately 11:00 pm, June 13, 2013 through about 5:30 am, June 14, 2013. [Hensley Decl. at ¶ 33].

54. As to the second statutory penalty factor, economic benefit, the proposed penalty far exceeds any economic benefit obtained by the Defendant. The point of the economic benefit factor is clear: "Insuring that violators do not reap economic benefit by failing to comply with the statutory mandate is of key importance if the penalties are successfully to deter violations." *See* Atlantic States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1141 (11th Cir. 1990). Essentially, this is a calculation of the costs, both avoided and delayed, that should have been spent by Williams but were not. In order to assess the avoided and delayed costs of compliance, EPA used what is known as the BEN methodology (BEN), which is an EPA computer model based on generally accepted financial principals used to calculate the benefit of delayed and avoided costs. Using BEN, EPA calculated the economic benefit gained by Williams to be between $5,000 and $11,993. [McDowell Decl. at ¶¶ 15, 16]. Williams may argue that it did not receive any economic benefit from the violations given the resulting costs and damages it had to pay as a result of the Incident. Regardless, under any theory of penalty calculation, the proposed penalty amount properly addresses this penalty factor because the $750,000 penalty greatly exceeds any potential economic benefit gained by Williams for the violations alleged in the United States' Complaint.

55. As regards the third statutory penalty factor, penalties for the same incident, the

United States determined that the penalties the Defendant had already paid to OSHA and to the state of Louisiana, could be offset, in whole or part, by a court were the matter to proceed to trial. Similarly, the United States' considered the possibility that that a court could view the nominal amount of the OSHA penalty ($36,000) as representative of the value or significance of the CAA's analogous Part 68 regulations (*the* Chemical Accident Prevention Provisions). The United States also considered the possibility that a court could view the Defendant's settlement with the state of Louisiana ($15,600), and the significant damages awarded to Plaintiffs in the several tort suits as mitigating factors in determining an appropriate penalty.

56. As regards the fourth statutory penalty factor, EPA considered the Defendant's compliance history in determining the appropriate civil penalty in this matter. To do so, EPA used its Enforcement and Compliance History (ECHO) data base to assess the Defendant's compliance history pertaining to formal and informal enforcement actions across all environmental media over a five year period concluding in 2017. [McDowell Decl. at ¶ 28].

57. Under the fifth statutory penalty factor, EPA considered the duration of the violations alleged in the Complaint. For purposes of determining their duration, violations are assumed to be continuous from the first provable date of the violation until the violator demonstrates compliance. EPA determined that the violation for failure to document sixteen PHA recommendations (Claim No. 4, 40 C.F.R. 68.67(e)) may have had a duration of as long as twenty-one months. While it is unclear, based on the available evidence, whether the sixteen PHA recommendations were fully addressed, it has been established, and the violation is based on, the Defendant's *failure to document* resolution of the PHA recommendations in the Plant's Action-Item Tracking System, only two of which were related to the Incident.

58. Pursuant to EPA's discretionary authority to assess multi-day penalties, the United States determined that an appropriate penalty for this violation should be the then statutory maximum of $37,500 per day multiplied by 21, one day for each month of noncompliance. [McDowell Decl. at ¶¶ 25-27].

59. As regards the sixth and seventh statutory penalty factors, EPA considered the size of the Defendant's business, and the penalties' potential economic impact on the business and concluded that a penalty of as much as one million dollars would not detrimentally impact the business. [McDowell Decl. at ¶¶ 17].

60. In addition to the key penalty factors relating to the violations, both the statutory penalty factors and the applicable settlement policy allow for mitigation of a civil penalty where appropriate. Here, some mitigation of the penalty was appropriate given Williams' good faith efforts to bring the Plant into compliance by making extensive modifications to the Plant's design and safety systems and its operating and training procedures before concluding the settlement. *See* 42 U.S.C. § 7413(e).

61. Finally, the United States' penalty mitigation also considered litigation risks, including the virtual certainty that this case will require a battle of experts.

62. There is no guaranty that, if trial ensued, the judgment would be favorable to the United States or that the Court would order the same penalty as recovered under the Stipulation.

63. The United States believes that it has strong claims against the Defendant. The Defendant disagrees. It believes that it has viable defenses to the United States' claims. The United States must consider the risk that it will not prevail on its claims or that the Court could order a smaller penalty. The Stipulation expresses the parties' careful and informed assessment of the relative merits of each other's claims while taking into consideration the risks, costs, and

time inherent in litigating a case of this magnitude. The Stipulation reflects a reasonable compromise of the risks facing the United States if forced to litigate this matter. Yet it holds Williams accountable for its conduct and delivers results immediately. *See* Akzo Coating, 949 F.2d at 1436 n.25 (*quoting* United States v. Hooker Chemicals & Plastics Corp., 540 F. Supp. 1067, 1080 (W.D.N.Y. 1982)), ("[w]eighing strongly in favor of approval is the fact that the plan can be implemented immediately"). Accordingly, the Stipulation is fair, adequate, reasonable, and in the public interest.

D. The Proposed Stipulation is Faithful to the Objectives of the Clean Air Act

64. The Stipulation comports with the public health and environmental goals of the CAA. *See* BP Exploration & Oil Co., 167 F. Supp.2d at 1054 (explaining that the "most important factor as to public policy is whether the decree comports with the goals of Congress"). As discussed above, the Stipulation provides for a substantial civil penalty intended to punish the Defendant and deter it and others from violating the statute in the future.

65. The Stipulation, thus, helps to further the primary purpose of the CAA to "protect and enhance the quality of the Nation's air resources." *See* 42 U.S.C. § 7401(b)(1). Under the Stipulation, this benefit will accrue without litigation delays or costs. *See* Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir. 1976) (*citing* D. H. Overmyer Co. v. Loflin, 440 F.2d 1213 (5th Cir. 1971)) (public interest furthered by voluntary settlement that secures a ". . . reasonable remedy for the dispute").

66. Williams rebuilt the affected components within the Propylene Production Unit, and completed extensive modifications to the Plant's design and safety systems – including adding offline pressure vessels to the Plant's pressure relief systems, and upgrading the safety equipment on the Plant's furnaces and pressure vessels – prior to concluding the settlement.

67. To confirm these changes, the United States sent our consulting expert, Neil Mulvey, to the Plant on two occasions. On both occasions, Mr. Mulvey conducted walk-through inspections of the rebuilt PPU, interviewed plant personnel, and, after reviewing hundreds of pages of documents consisting of, among others, after-Incident reports, revised piping and instrument diagrams associated with the PPU, updated Process Hazard Analysis protocol, new and revised operator procedures, and updated training programs, Mr. Mulvey concluded that Williams, now, NOVA Chemicals Olefins, has taken reasonable and prudent corrective action "to eliminat[e] and/or minimize the likelihood of a reoccurrence of an event similar to the INCIDENT." [Mulvey Decl. at ¶ 7, 8, 9, & 23].

68. In light of the aforementioned reasons, this settlement furthers the goals of the CAA and is in the public interest.

VII. <u>CONCLUSION</u>

69. The Stipulation is fair, reasonable, adequate, and consistent with the purposes of the CAA. For these reasons, the United States respectfully requests that the Court grant the Consent Motion to Approve Stipulation of Settlement by signing and entering the Stipulation as a final judgment in this matter. No proposed order is attached because the Stipulation contains a signature block for the Court on page 10.

Dated: December 6, 2019

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

Karen Dworkin
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

24

/s/ Kirk W. Koester
Kirk W. Koester
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
kirk.koester@usdoj.gov

John Gaupp
Assistant United States Attorney
Louisiana Bar No. 14976
777 Florida Street, Suite 208
Baton Rouge, Louisiana  70801
Phone: 225.389.0443
john.gaupp@usdoj.gov

Of Counsel:
Jeff Clay, Esq.
Assistant Regional Counsel
Office of Regional Counsel, ORCE
United States Environmental Protection Agency Region 6
1201 Elm Street, Suite 500
Dallas, Texas  75270-2102

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of December, 2019, I served a copy of the foregoing,

UNITED STATES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF CONSENT

MOTION TO ENTER STIPULATION OF SETTLEMENT, filed with the Clerk of the United

States District Court for the Middle District of Louisiana using the Court's CM/ECF system.

Notice of this Electronic Filing will be sent to all registered parties by operation of the Court's

CM/ECF system. Additional notice has been sent as indicated below.

<u>/s/ Kirk W. Koester</u>

Katie D. Bell, Esq. (#29831)                       [] Overnight Mail
KEAN MILLER LLP                                        [] U.S. Postal Service
II City Plaza, 400 Convention Street, Suite 700    [] U.S. District Court ECF/CM
Post Office Box 3513 (70821)                        [x] electronic mail
Baton Rouge, Louisiana  70802
Telephone: 225.387.0999

Peter Modlin, Esq.                                 [] Overnight Mail
Gibson, Dunn & Crutcher LLP                         [] U.S. Postal Service
555 Mission Street                                 [] U.S. District Court ECF/CM
San Francisco, CA  94105-0921                      [x] electronic mail
PModlin@gibsondunn.com

Jeff Clay, Esq.                                    [] Overnight Mail
Assistant Regional Counsel                         [] U.S. Postal Service
Office of Regional Counsel, ORCE                   [] U.S. District Court ECF/CM
United States Environmental Protection Agency      [x] electronic mail
Region 6
1201 Elm Street, Suite 500
Dallas, Texas  75270-2102

26